

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

*Paul Riley*  *Suite 400*  DIRECT: 410-209-4959
*Assistant United States Attorney*  *36 S. Charles Street*  MAIN: 410-209-4800
*Paul.Riley@usdoj.gov*  *Baltimore, MD 21201-3119*  FAX: 410-962-3091

<u>**VIA ECF**</u>  June 18, 2024

The Honorable Richard D. Bennett
United States District Judge
United States District Court
for the District of Maryland
101 West Lombard Street
Baltimore, MD 21201

Re:   *United States v. Ahmed Sary*, Criminal No. RDB-23-344

Dear Judge Bennett:

The Government writes this letter in advance of the sentencing of Ahmed Sary, which is currently scheduled for June 25, 2024 at 11:00 a.m.  On October 18, 2023, the Court accepted Defendant's guilty plea to Count One of the Information, charging him with Wire Fraud Conspiracy, in violation of 18 U.S.C. §§ 1343, 1349.

As set forth more fully below, the Government requests that the Court sentence Defendant to 114 months' (9 years and six months') imprisonment, to be followed by three years of supervised release, and order restitution in the amount of $17,901,279.87 to the various victims in this case.

**I.   Background**

As detailed in the parties' plea agreement filed October 18, 2023 (ECF No. 66) and the Presentence Investigation Report (PSR) filed December 20, 2023 (ECF No. 69), for a period of nearly two years—beginning in April 2020 and continuing through January 2022—Defendant and his co-conspirators (including co-conspirator H.D.) repeatedly defrauded the United States Small Business Administration (SBA) and various financial institutions to obtain numerous fraudulent Paycheck Protection Program (PPP) loans and Economic Injury Disaster Loans (EIDLs).

Defendant prepared nearly 150 false and fraudulent EIDL and PPP loan applications for purported businesses that did not exist in any legitimate capacity and that included false information concerning, among other things, number of employees, monthly payroll costs, and revenue.  The PPP applications routinely included false and fraudulent Internal Revenue Service ("IRS") tax forms created by H.D. and that were provided to Defendant, along with fabricated bank statements prepared by Defendant.  These forms were submitted by Defendant and his co-conspirators with the PPP applications to substantiate the false representations made in the applications.

Defendant received kickback payments from the loan borrowers in exchange for his assistance in connection with the submission of fraudulent PPP and EIDL applications, ultimately receiving $2,714,217.22 in kickbacks as a result of the scheme to defraud charged in Count One of the Information.  These kickbacks amounted to, at times, up to 30% of the amount of the loan amount.

Defendant used the fraudulently obtained funds to travel to Dubai and Egypt on multiple occasions, to stay at luxury hotels (including the Four Seasons) while there, to purchase property in Egypt and to, among other things, open a beachfront restaurant in Alexandria, Egypt called Sary's Kitchen.

The conspiracy resulted in the disbursement of at least $14,807,609.37 in fraudulently obtained PPP funds in connection with more than 85 fraudulent PPP loans. More than 10 financial institutions were victims in connection with the scheme, and Defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of his offense.

The conspiracy likewise resulted in the disbursement of $3,093,670.50 in EIDL funds in connection with 57 EIDL applications.

In addition to the loan fee kickbacks, Defendant himself received $959,559.00 in PPP/EIDL funds for various purported businesses that he controlled. Defendant's crimes are discussed in further detail below.

### Fraudulent Applications For Businesses Associated With Defendant

As an initial matter, in connection with the conspiracy and scheme to defraud, Defendant submitted multiple false and fraudulent EIDL and PPP loan application in connection with various purported businesses for which he owned or otherwise had an interest—a purported financial services business (AMEX Financial Group), a purported meatpacking business (Am Halal Meat), a purported clothing company (Exclusive Menswear) and a purported talent agency (Sary Stars). In fact, none of these businesses existed in any legitimate capacity. Information about each of these fraudulently obtained loans are set forth in the below table:

| Entity | SBA Loan Type | Loan Amount | Funded Date |
| --- | --- | --- | --- |
| Am Halal Meat Inc | PPP | $119,311 | 6/19/2020 |
| Am Halal Meat Inc | EIDL Advance | $10,000 | 6/23/2020 |
| Am Halal Meat Inc | EIDL | $40,000 | 6/24/2020 |
| Am Halal Meat Inc | PPP | $119,310 | 2/20/2021 |
| AMEX Financial Group Inc | EIDL | $145,000 | 6/11/2020 |
| Sary Stars Inc | PPP | $102,000 | 5/27/2020 |
| Sary Stars Inc | EIDL Advance | $8,000 | 6/23/2020 |
| Sary Stars Inc | EIDL | $117,000 | 6/24/2020 |
| Exclusive Menswear Inc. | EIDL Advance | $10,000 | 7/07/2020 |
| Sary Stars Inc | PPP | $102,000 | 2/24/2021 |
| Exclusive Menswear Inc. | PPP | $70,326 | 6/23/2020 |
| Exclusive Menswear Inc. | PPP | $70,325 | 2/11/2021 |
| **Total** | | **$913,272** | |

Defendant also submitted fraudulent loan applications for a purported pizza business (AMT Pizza) that he owned that resulted in the funding of a $65,000 EIDL loan and a $139,938 PPP loan. All of these loan funds were ultimately returned to the PPP lender and the SBA in light of suspected fraud.

The EIDL applications associated with each of the above EIDLs contained multiple material misrepresentations concerning each purported business's existence, gross revenues and

2

operating expenses, and each application resulted in the disbursement of funds to bank accounts controlled by Defendant.

Likewise, the PPP applications associated with each of the above PPP loans contained multiple material misrepresentations concerning, among other things, each purported business's existence, number of employees, and wages paid, and each application resulted in the disbursement of funds to bank accounts controlled by Defendant.

The PPP applications also contained false and fraudulent IRS Forms 1120 (Corporation Income Tax Return), 941 (Employer's Quarterly Federal Tax Return), 944 (Employer's Annual Federal Tax Return) and W-3 (Transmittal of Wage and Tax Statements), which contained multiple material misrepresentations including the number of employees of each purported business and the wages paid; this information was used to substantiate information in the PPP loan applications.

IRS records indicated that there was no record of business tax filings for any of Am Halal Meat, AMEX Financial Group, AMT Pizza, and Sary Stars for the tax years 2019 or 2020.

**Loan Kickback Scheme**

In addition to obtaining fraudulent PPP and EIDL funds for his own purported businesses, Defendant engaged in a scheme with co-conspirator H.D. to assist other co-conspirators with obtaining EIDL and PPP loans for various purported businesses that did not exist in any legitimate capacity in exchange for a kickback payment. Sary would receive a kickback (typically 20% to 30% of the fraudulent loan amount) in exchange for his services and, at times, would give H.D. a small portion of that fee (typically 2% to 5% of the fraudulent amount) if H.D. assisted with the fraudulent application.

These applications grossly inflated the numbers of employees and grossly inflated monthly payroll costs of the purported businesses. The PPP applications contained various false and fraudulent IRS records prepared by H.D. and provided to Defendant to support the payroll figures included in the fraudulent PPP applications, including false United States Internal Revenue Service ("IRS") Forms 940 (Employer's Annual Federal Unemployment Tax Return, 941 (Employer's Quarterly Federal Tax Return), and 944 (Employer's Annual Federal Tax Return) for the purported businesses.

The purpose of the false IRS and fraudulent Forms 940, 941, and 944 was to circumvent Cross River Bank's requirement and the requirement of other SBA-approved lenders that prospective borrowers submit documentation to support the payroll figures that served as the basis for the PPP loan amount.

The PPP applications likewise contained false and fraudulent February 2020 bank statements prepared by Defendant, which were meant to circumvent Cross River Bank's requirement and the requirement of other SBA-approved lenders that prospective borrowers submit documentation to support the certification that the business was in operation on February 15, 2020.

Regarding Defendant's receipt of kickbacks in exchange for his work on the fraudulent PPP and EIDL applications, in order to conceal the nature of his scheme, Defendant laundered the payments through bank accounts he controlled but that were in the names of various associates and more than 15 shell companies controlled by Defendant, including the following entities: Am Halal Meat, AMEX Financial Group, AMT Pizza, Sary Stars, Black Diamond Sedan, Diva Productions, Vertical Payment Processing, Holand Livestock, NR1 Transport, and Exclusive Menswear.

The kickback payments were structured by Defendant and made in a manner to conceal the nature and total amount of the payments, and created the appearance that the payments were for legitimate business purposes—including by containing memos that indicated falsely that the payments were for business related purposes.

Defendant typically demanded that the loan recipient pay him for his services in connection with the fraudulent loan application. After the loan funds were received by the recipient, the recipient would typically provide Defendant multiple (sometimes up to seven) checks that were signed by the loan recipient and that listed a payment amount and date but that left the payee name blank. Defendant would then write a payee name on each of those checks and deposit them.

In connection with some of the fraudulently obtained PPP loans for purported businesses, Defendant also assisted the loan recipients with setting up payroll services with Payroll Processor 1 to make it appear that the fraudulently obtained PPP loan funds were being used for permissible purposes when they, in fact, were not.

Defendant was aware that proceeds from a PPP loan were required to be used only for certain permissible business expenses, including payroll costs, mortgage interest, rent, and utilities. Defendant was aware that, under the applicable PPP rules, interest and principal on a legitimate PPP loan were eligible for forgiveness, if the business spent the loan proceeds on permissible items within a designated period of time and used a certain portion of the loan toward payroll expenses.

The purpose of establishing payroll services for the loan recipients after receipt of the fraudulently obtained PPP loan funds was to facilitate the creation of documentation that could be used to substantiate a request for each respective PPP loan to be forgiven.

*Nutscola Street Promotions*

For example, on March 21, 2021, Defendant submitted a fraudulent PPP loan application to Cross River Bank for Nutscola Street Promotions (Nutscola), a business for which co-conspirator L.W. was the owner and resident agent and which had no employees at the time and was not in operation.

The PPP loan application contained multiple material misrepresentations, including that Nutscola had 13 employees and an average monthly payroll of $104,900.87. In support of the loan application, a fabricated Internal Revenue Service (IRS) Form 940—Employer's Annual Federal Unemployment Tax Return—was submitted, which falsely indicated that Nutscola's "[t]otal payments to all employees" in 2019 was $1,258,810.53.

The IRS Form 940 was not legitimate, and the information within it was false; Nutscola did not pay any wages to or withhold federal income tax from any employees during the 2019 tax year—as confirmed by IRS records.

Defendant also submitted with the application a fake and fraudulent February 2020 bank statement he prepared that purported to be from the Nutscola Chase account.

Based on the false representations and fraudulent submissions, on March 26, 2021, the PPP loan funded, and approximately $262,252 was distributed by Cross River Bank to the Chase account controlled by L.W.

L.W. agreed to pay Defendant a kickback payment for his work in submitting the false application and obtaining the fraudulent PPP loan. After the PPP loan funds were received by L.W., he provided Defendant with two checks totaling $78,000—one in the amount of $40,000 and one in the amount of $38,000—or approximately 30 percent of the PPP loan amount.

On each of those checks, L.W. left the payee name blank, and Defendant wrote the payee name on the checks. Defendant made the $40,000 check out to Am Halal Meat, and he made the $38,000 check out to Diva Productions—both entities Defendant controlled—in order to conceal the nature of his scheme. Defendant deposited both of the checks, and they were drawn on the bank account controlled by L.W.

Shortly thereafter, Defendant assisted L.W. with establishing payroll services for Nutscola with Payroll Processor 1 to facilitate the creation of documentation that could be used to substantiate a request for the PPP loan to be forgiven. In total, $159,000 in sham payroll payments were made using funds traceable to the PPP loan obtained by L.W. and Nutscola.

*Yazee, Inc.*

Likewise, on March 14, 2021, Defendant submitted a fraudulent PPP loan application to Cross River Bank for Yazee, Inc. (Yazee), a business for which co-conspirator A.Q. was the owner and resident agent. .

The PPP loan application contained multiple material misrepresentations, including that Yazee had 16 employees and an average monthly payroll of $100,289. In support of the loan application, a fabricated IRS Form 940—Employer's Annual Federal Unemployment Tax Return—was submitted, which falsely indicated that Yazee's "[t]otal payments to all employees" in 2019 was $1,203,471.52. The IRS Form 940 was not legitimate, and the information within it was false; Yazee did not pay any wages to or withhold federal income tax from any employees during the 2019 tax year.

Based on the false representations and fraudulent submissions made on behalf of A.Q. as the owner of Yazee, on March 22, 2021, the PPP loan funded, and approximately $250,723.00 was distributed by Cross River Bank to the Wells Fargo account controlled by A.Q.

A.Q. agreed to pay Defendant a kickback for his work in submitting the false application and obtaining the fraudulent loan. After the PPP loan funds were received by A.Q., he provided Defendant with eight checks totaling $75,000, or approximately 30 percent of the PPP loan. On each of those checks, A.Q. wrote the amount, but left the payee name blank. Attempting to conceal the nature of the payments, Defendant then wrote a payee name on each of the checks, making the checks out to entities that Defendant controlled—AMEX Financial Group, Am Halal Meat, Black Diamond Sedan, Diva Productions, Exclusive Menswear, and NR1 Transport. Defendant further attempted to create the appearance that the payments were for legitimate business purposes when they in fact were not—including by writing memos that indicated the payments were for business related purposes.

For example, the $5,000 check to Exclusive Menswear contained a memo written by Defendant falsely indicating that the check was for "uniforms." The $10,000 check to Diva Productions contained a memo written by Defendant falsely indicating that the check was for "marketing." The $10,000 check to NR1 Transport contained a memo written by Defendant falsely indicating that the check was for "transportation." The $10,000 check to AMEX Financial Group contained a memo written by Defendant falsely indicating that the check was for "financial planning."

Defendant also assisted A.Q. with establishing payroll services for Yazee with Payroll Processor 1 to facilitate the creation of documentation that could be used to substantiate a request for the PPP loan to be forgiven, which it ultimately was. In total, $144,647.21 in sham payroll payments were made using funds traceable to the PPP loan obtained by A.Q. and Yazee.

**Total Actual Losses Associated With the Conspiracy**

In total, Defendant's conspiracy with H.D. resulted in the disbursement of $14,807,609.37 of fraudulently obtained funds in connection with more than 85 fraudulent PPP loans.

Moreover, as noted above, Defendant submitted numerous fraudulent EIDL applications in connection with his scheme. Ultimately, $3,093,670.50 in EIDL funds were disbursed in connection with 57 EIDL applications which contained material misrepresentations concerning, among other things, each purported business's existence, gross revenues and operating expenses.

**Federal Search Warrant**

Defendant was arrested on April 29, 2022 and, that same day, search warrants were executed at the office of AMEX Financial Group located at 1600 Hanover Street in Baltimore, an apartment adjoining the office, and Defendant's residence. From Defendant's office and the apartment adjoining Defendant's office, law enforcement seized numerous pieces of evidence related to Defendant's scheme.

Law enforcement seized over 90 hard copies of files related to the submission of PPP/EIDL applications for various entities. These files contained large amounts of personal identifying information—copies of driver's licenses, social security cards and numbers, bank statements, as well as copies of checks, and PPP application paperwork.

Some of the files contained the false and fabricated bank statements and tax documents submitted by Defendant in connection with fraudulent PPP applications. Law enforcement likewise seized numerous kickback checks from entities that received PPP loans. The checks were signed and a payment amount was listed, but the payee was blank. Law enforcement also seized pre-signed blank checks from a number of the entities used by Defendant to launder the kickback payments from the PPP loan recipients.

## II. Guidelines Computation

Under the U.S. Sentencing Guidelines, the Defendant's total offense level should be calculated as 31 rather than 33, as calculated in the PSR. PSR at 12. The PSR correctly applies all applicable enhancements and reductions for acceptance of responsibility. *Id.* However, it does not include a reduction under U.S.S.G. § 4C1.1 (Adjustment for Certain Zero-Point Offenders), which—based on the facts and circumstances of this case—applies here.[1] Accordingly, the Court should find that the total offense level is 31 and order that the PSR be amended to reflect an adjustment under § 4C1.1.

The Defendant is a Criminal History Category I. PSR at 12. Thus, the applicable guideline imprisonment range as to Count One is 108-135 months' imprisonment.

## III. Sentencing Factors Under 18 U.S.C. § 3553(a)

The sentencing factors under 18 U.S.C. § 3553(a) support a sentence of 114 months' imprisonment.

Such a sentence is necessary to reflect the seriousness of the offense and protect the public from further crimes of the Defendant, as well as to afford adequate deterrence, promote respect for the law, and provide just punishment. It also takes into account Defendant's history and characteristics.

---

[1] Defendant meets all of the criteria for the adjustment under 4C1.1 that are listed in subsection (a) of that guideline.

Regarding the nature and circumstances of the offense, there is no question that Defendant's offense is serious. During the most traumatic global pandemic in a century, Defendant was responsible for the theft of nearly $20 million in public funds that were intended to prop up our nation's small businesses so that they could avoid economic collapse. Simply put, the total *actual* loss is in this case is staggering.[2] And Defendant stole these funds to line his own pockets. These funds—meant to help struggling businesses—were instead used for numerous luxury overseas trips to Defendant's home country of Egypt (and stays at five-star hotels such as the Four Seasons), to purchase real property there, and even to open a beachfront restaurant in his birth city of Alexandria, Egypt.

In total, Defendant and his numerous co-conspirators obtained at least $14,807,609.37 in connection with 85 fraudulent PPP loans and $3,093,670.50 in connection with 57 fraudulent EIDL applications. Defendant received the PPP and EIDL funds for his own purported businesses, of course, and then took a 20% to 30% cut of every fraudulent loan that he submitted for his co-conspirators. Again, these are actual losses that do not reflect Defendant's attempt to steal millions of dollars more in pandemic relief funds. Simply put, Defendant saw an opportunity for "free money" from the Government, and he took it. And his business, his "source of income," during this time period was fraud.

Defendant lied on numerous loan applications—his own and those of his co-conspirators. He prepared bogus documents to be submitted with PPP applications. He engaged in a sophisticated money laundering scheme by laundering the kickback payments he received through more than 15 shell companies controlled by Defendant. He directed numerous other individuals in connection with this money laundering scheme. And he coached fraudulent PPP recipients regarding setting up payroll services to make it appear that the fraudulently obtained loan funds were being used for permissible purposes when they, in fact, were not. Defendant served as the engine of a massive PPP loan scheme involving easily 100 individuals and purported businesses throughout the country. He was the boss, the mastermind, and the man who put the plan into action.

What's more, Defendant's offense was not the result of a momentary lapse of judgment by an otherwise law-abiding citizen. It was not a split-second decision made under financial duress. Just the opposite. When the opportunity arose, Defendant wrongfully took advantage of a relief program meant to aid victims of an unprecedented public health and economic crisis by facilitating well over 140 fraudulent PPP and EIDL loans. His actions were calculating, sophisticated and protracted—lasting for almost two years.

Defendant's choice to misappropriate PPP and EIDL funds funneled critical resources away from legitimate businesses that did not survive the pandemic. Indeed, in the early days of the COVID-19 pandemic, people stayed home, businesses closed their doors, and workers were laid off. America was effectively shut down. In the face of chaos and uncertainty, the Government moved quickly to establish pandemic relief programs, like PPP and EIDL, for suffering people and businesses. And to get money quickly to people who needed it most, these pandemic relief programs relied on applicants to tell the truth. But in the face of this crisis, Defendant did the opposite—he saw an opportunity to enrich himself based on lies, and he took it again and again.

Simply put, these pandemic loan programs were intended to be a lifeline, not a payday. Defendant's actions were self-serving and inexcusable. The scope of his conduct was extensive—with respect to the length of time Defendant perpetrated his scheme, the number of co-conspirators

---

[2] The attempted loss was substantially higher.

involved (dozens), the amount of loss, and the sophistication of the scheme. The nature and circumstances of the offense warrant the Government's recommended sentence.

So too does the Government's recommended sentence reflect the seriousness of Defendant's misconduct, provide just punishment, and promote respect for the law. The PPP was designed to be a safety net to keep the nation's small business in operation during the most significant global pandemic in 100 years. Unfortunately, due to the conduct of people like Defendant, a staggering amount of pandemic relief funds did not reach the businesses and employees that needed those funds most. The SBA Office of Inspector General estimates that as much as 17% of the disbursements from pandemic-relief programs like the PPP went to fraudulent applicants like Defendant.[3] Indeed, the PPP had a finite pool of money; during the first round of the PPP, the program was depleted in just 13 days.[4] Given the high levels of fraud in connection with PPP funds, there is a particularly substantial need to promote respect for the law and provide just punishment for the offense.

The recommended sentence will also serve as specific deterrence for Defendant. Defendant had numerous opportunities to stop his criminal conduct. But it instead went on for nearly two years. A long prison sentence is necessary to protect the public from him. Indeed, Defendant is far less likely to commit crime while incarcerated. And he has made clear that, when given the opportunity to lie to get money, he will take it. The necessity for a significant prison sentence to prevent Defendant from committing additional fraud is made more apparent by the efforts he took to conceal his involvement in the instant crimes. For instance, his name was not listed on the fraudulent PPP loan applications he submitted on behalf of his co-conspirators. He was careful to direct his co-conspirators to provide him with multiple kickback checks (sometimes up to seven) that Defendant would go on to make out to various shell companies he controlled to conceal the nature and source of the payments. And, to create a paper trail to substantiate purported employees after the fraudulent loans closed, he directed his co-conspirators to a payroll company that he had an existing relationship with and had then enlist the company's services. In other words, Defendant understands how to make his crimes more difficult to detect.

The need to avoid unwarranted sentencing disparities is also important in this case. To date, a number of Defendant's co-conspirators have pleaded guilty and been sentenced by the Court for their crimes with Defendant. One PPP loan recipient who received $262,252 in connection with the scheme and paid Defendant a kickback of $78,000 was sentenced by the Court to 24 months' imprisonment and six months' of home confinement. *See United States v. Walker*, Criminal No. RDB-22-290.[5] Another who received $1,018,224 in connection with the scheme and paid Defendant kickbacks totaling $177,000 was sentenced to 24 months' imprisonment. *See United States v. Hopkins*, Criminal No. RDB-23-316.[6]

---

[3] *See* Small Business Administration, COVID-19 Pandemic EIDL and PPP Loan Fraud Landscape Report, *available at* https://www.sba.gov/document/report-23-09-covid-19-pandemic-eidl-ppp-loan-fraud-landscape ("We estimate that SBA disbursed over $200 billion in potentially fraudulent COVID-19 EIDLs, EIDL Targeted Advances, Supplemental Targeted Advances, and PPP loans. This means at least 17 percent of all COVID-19 EIDL and PPP funds were disbursed to potentially fraudulent actors.").

[4] *See* PBS Newshour, It took 13 days for the Paycheck Protection Program to run out of money. What comes next?, *available at* https://www.pbs.org/newshour/politics/it-took-13-days-for-the-paycheck-protection-program-to-run-out-of-money-what-comes-next

[5] Walker's sentencing guidelines range was 30-37 months' imprisonment.

[6] Hopkins' sentencing guidelines range was 41-51 months' imprisonment. Hopkins had no criminal history.

Defendant submitted all of these fraudulent loans and nearly 150 others and caused actual losses in excess of almost $18 million, receiving kickbacks from numerous co-conspirators along the way. In short, Defendant was the ringleader of the conspiracy and should be punished accordingly. The Government's recommended sentence of 114 months' imprisonment here appropriately reflects the differences among these defendants while avoiding unwarranted disparities.

It is notable too that pandemic loan fraud cases involving criminal conduct similar to the offense conduct at issue here—including the submission of fraudulent pandemic loan applications containing fake IRS forms and false information regarding nonexistent businesses during a time of national crisis—have routinely yielded significant sentences. *See, e.g.*, *United States v. Aqeel*, 20-cr-00583 (S.D. Tex. 2020) (receiving 15-year sentence in connection with conspiracy involving at least 14 other individuals, 75 fraudulent PPP loan applications in 2020, and losses in excess of $20 million); *United States v. Quin Rudin*, 22-cr-46 (E.D. Va. 2022) (receiving 10 year sentence in connection with PPP fraud scheme in which losses exceeded $40 million and in which the defendant and his conspirators prepared fraudulent PPP loan applications backed by fake IRS documents in exchange for a fee of 30% of the fraudulent loan); *United States v. Joseph Marsell Cartlidge, Eric Alexander McMiller, and David Christopher Redfern*, 1:20-CR-340 (M.D.N.C. 2022) (receiving 72 months, 66 months, and 60 months of imprisonment, respectively, for submitting fraudulent PPP and EIDL applications with false information and fake tax forms, fraudulently seeking approximately $2.7 million and obtaining $1.2 in loans); *United States v. Lola Kasali*, 4:20-MJ-1106 (S.D. Tex. 2022) (receiving 70 months of imprisonment for submitting two fraudulent PPP loan applications with false information and fake tax forms, fraudulently obtaining $1.9 million in loans); *United States v. Tarik Freitekh*, 3:20-CR-00435 (W.D.N.C. 2022) (receiving 87 months of imprisonment for submitting fraudulent PPP applications, and fraudulently obtaining $1.75 million in loans);[7] *United States v. Adam D. Arena*, 21-MJ-05134 (W.D.N.Y. 2022) (receiving 66 months of imprisonment for his role in fraudulently obtaining and laundering approximately $950,000 in pandemic loans); *United States v. Joshua Bellamy*, 21-CR-60064 (S.D. Fla. 2021) (receiving 37 months of imprisonment for obtaining and laundering a $1,246,565 PPP loan and paying co-conspirator $311,000 kickback in exchange for preparing and submitting application); *United States v. Hassan Kanyike*, 21 Cr. 50269 (C.D. Cal. 2021) (receiving sentence of 51 months for after obtaining 4 PPP loans valued at approximately $1,000,000); *United States v. Leslie D. Bethea*, 22 Cr. 52 (E.D. Tenn. 2022) (defendant on federal supervised release at time of the offense received 78 month sentence in connection with $20,805 PPP loan, which she used to finance a trip to a resort in Florida).

Finally, regarding Defendant's history and characteristics, it is true that the instant offense is Defendant's first federal conviction, that the crime is non-violent, and that Defendant apparently is a present father to his multiple children. While these points merit consideration by the Court in determining the appropriate sentence, they do not support a variant sentence.[8] In fact, compared to many other defendants, Defendant has benefitted from numerous positive factors in his life, including a loving and supporting family and naturalized United States citizenship. There simply

---

[7] The Government understands Tarik Freitekh to be an associate of Defendant.

[8] Defendant's employment history is limited. Both of the purported businesses listed in the PSR (at 86-87) were part of the offense at issue in this case. It is unclear if Defendant has had other employment since he arrived in the United States in 2000. The PSR notes a judgment in the amount of $119,863.25. PSR at 16. This judgment arises out of the Defendant in January 2017 obtaining a Rolls Royce Ghost vehicle valued at over $100,000—a vehicle never recovered—and his default on the installment contract under the loan.

are no extenuating or mitigating factors in this case that warrant a downward variance from the Guidelines.

### IV. The Government's Sentencing Recommendation

In light of all of the factors set forth above, the Government recommends that the Court sentence the Defendant to a term of imprisonment of 114 months' imprisonment to be followed by three years' supervised release. Such a sentence would be sufficient but not greater than necessary to accomplish the purposes of sentencing under the Section 3553(a) factors.

The Government also asks that the Court enter a money judgment in the amount of $3,627,489.22 and order restitution in the amount of $17,901,279.87 to be due and payable immediately, with the following amounts joint and several as set forth below in connection with the following related cases:

- *United States v. Walker*, Criminal No. RDB-22-290
    - Cross River Bank – $262,252
- *United States v. Hopkins*, RDB-23-316 – $1,016,224.00 (total)
    - Cross River Bank: $716,134
    - Celtic Bank: $291,090
    - Small Business Administration: $9,000.
- *United States v. Qureshi*, JKB-22-0330
    - Cross River Bank: $250,723.00
- *United States v. Gillespie*, RDB-23-321
    - Cross River Bank: $138,104.

Respectfully submitted,

Erek L. Barron
United States Attorney

By:    /s/
Paul A. Riley
Assistant United States Attorney

cc:    Julie Reamy, Esq. (by ECF)
       Jessica Jackson, U.S. Probation Officer (by electronic mail)